**STEEL AND TUBES, Inc., v. GREENPOINT METALLIC BED CO., Inc.**

District Court, E. D. New York. December 31, 1929.

No. 4001.

Cooper, Kerr & Dunham, of New York City (Drury W. Cooper, of New York City, F. O. Richey, of Cleveland, Ohio, and Dean S. Edmonds and Ernest D. Given, both of New York City, of counsel), for plaintiff.

Gifford, Scull & Burgess, of New York City (William F. Wilder, Newton A. Burgess, and Livingston Gifford, all of New York City, of counsel), for defendant.

GALSTON, District Judge. This is a patent infringement action, involving United States letters patent No. 1,388,434 and letters patent No. 1,435,306, the former for a method and apparatus for butt-welding thin-gage tubing, and the latter for butt-welded thin-walled tubing. Both patents have been sustained in this district and by the Circuit Court of Appeals. Elyria Iron & Steel Co. v. Mohegan Tube Co., 7 F.(2d) 827, 829.

In consequence, the issues are necessarily narrowed to a consideration, so far as the question of validity is concerned, to the additional prior art adduced herein, and in the matter of infringement to distinguishing the alleged infringing process and product from those held to infringe in the Mohegan Case. Claims 4, 5, 10, 14, 16, 17, and 19 of the process and apparatus patent, and claims 3, 5, 6, and 9 of the product patent, were sustained in the earlier litigation; those and the additional claims 1, 2, 22, and 23 of the method and apparatus patent are involved herein.

Failures of the prior art in respect to effecting electric welding of thin-walled tubes are summed up by the inventor in patent No. 1,388,434, and are said to consist in inaccurate registering of the edges to be welded; ignorance as to the supply and control of the heating current; destruction of portions of the edges to be welded by fusing or burning too much of the areas; overheating or underheating the areas; improperly compressing the edges into lapped relationship; lack of uniformity in heating the edges to be welded; inability to apply at the all-important moment compression at the edges, and to correlate speed of travel of the stock, and the amount, character, and manner of the heating current. Essentially it is the correlation "of the factors of stock-feeding rate, current control, and pressure application" that enabled the inventor to overcome these failures of the prior art.

It is asserted by way of defense here, as doubtless it was in the Mohegan Case, that

the patents in suit are vague, in that only relative terms are used; that, though much is said about co-ordination of time, heat, pressure, and contact, no specific information is given as to how these factors are to be correlated. What do the patent specifications say on this subject of correlation?

In patent No. 1,388,434 we find, in respect to the matter of heating, the following: "I discovered that the proper application of the heating current involves using a relatively large amperage." What is a "relatively large amperage"? Does such term instruct the artisan? Of itself it probably does not, but on page 3, line 27, of the patent, Johnston states the apparent current should be 12,000 amperes at an apparent voltage of approximately 1.5 volts, measured across the insulated gap of the roller electrodes at the nearest accessible point to their points of contact with the tube to be welded, when such welding tube is of .025 gage.

What is said about time—i. e., rate of speed of the stock? The inventor states that in carrying his invention into practice he found that the apparatus which propels the tube blank through the welding pass should be so organized as to feed the stock at a steady and substantially uniform speed. He says that the feed rate should be sufficiently fast to remove the welded tubing quickly from the influence of the welding current. The speed of travel through the welding throat is to be such as to carry the progressively heated portions substantially out of the heating zone "fast enough to arrest the raising of the temperature as soon as any given portion has reached the required welding temperature." Thus far there is no suggestion made as to specific speed, and the instruction is in relative terms. Later, however, the inventor says that he has produced commercial tubing at about 70 feet per minute. In view of existing knowledge of gear ratios in determining speed of machinery, it would seem that the instruction as to correlation of speed with heat is sufficiently specific.

Pressure is the next factor. As to this point there is quite definite instruction given. The inventor accounts for success on the theory that "the weld is effected by relatively high pressure and compression at a relatively low temperature, or it may be due to the high degree of localization of the heat and its rapid dissipation after passing through the throat. Doubtless both of these factors contribute to the successful result."

The inventor emphasizes: "That the welding throat be formed of members conformed to the shape of the tube and which collectively completely, or substantially completely, inclose and support the blank through the entire circumference, thus providing against distortion of the thin tube under compression; the rolls which constitute the welding throat all having their axes in the same, or approximately the same, cross-sectional plane, so that the confining of the blank is coincident with the closing pressure thereon; while to provide good electrical contact between the abutting edges of the tube blank and between the tube blank surfaces and the electrodes, the size of the throat should be sufficiently less than the external size of the tube blank passing therethrough to insure a pronounced compression and upsetting or mashing together of the edges of the blank at the time of welding, but only, in the best practice, to a degree producing but a small burr accordant with the restriction of the greatest softening effect substantially to the lips of the seam cleft."

Thus it is seen that the matter of pressure and contact are closely related. Definite specification is given of the area of contact and the electrodes. They must be such as to contact "with a relatively large arc of the circumference of the blank," as is shown in Figures 4 and 7 of the patent. The specification says, in explanation of what is meant by a relatively large arc of the circumference of the blank that is to be contacted: "The groove *155* is in shape almost a complete semicircle, and, in conjunction with a similarly shaped groove *157* in the lower roll *137*, forms a circle having a diameter equal to that of the tube *158* being operated upon."

The apparatus for carrying out the correlation of stock-feeding rate, current control, and pressure and contact application is described with minute particularity. It would seem, therefore, that there is enough indicated to enable the artisan, skilled in the welding art, successfully to practice the inventions described. At any rate, the same conclusion was, of course, reached in the Mohegan Case.

Now, as to the added matter in respect to invalidity: This seems to be predicated particularly on Thomson patent No. 347,140, and Thomson patent No. 444,928, when considered with Parpart patent No. 358,741. In the Mohegan Case the defense relied on the Parpart machine, and, though the Thomson patents were cited in the answer, it does not appear that they were offered in evidence at the trial. The defendant now takes this position:

While admitting that the Parpart patent is the closest reference of the prior art, it is contended that what Parpart disclosed in his

patent was ineffectually carried out in practice by the Standard Welding Company, which controlled the Parpart patents, and that, had the Standard Welding Company embodied in its practice with the Parpart machine the disclosures made in the two Thomson patents, Johnston would in all respects have been completely anticipated.

Before we discuss the two Thomson patents, it would be well to inquire in what respect the operation of the Parpart machine was, as the defense contends, "stupid." The defendant argues that the description of the operation of the Parpart machines by Mr. Sessions indicated inefficient and unintelligent management and failure to realize the value of the Parpart patent. Mr. Sessions testified:

"With his right hand he (the operator) fed the tubes into the rolls. As the tube came in contact with the electrode, the operator closed the switch and turned on the welding current. Then he varied the current by current-controlled means—this is a matter of judgment. While performing those activities, he had to keep his eye on the welding seam continuously, and with his free hand he started and stopped the driven motor."

The defendant points out that, had the Parpart welding machine been supplied by the Standard Welding Company with a forming machine, so that a continuous feed of tube blank could have been sent through, the operator would have had nothing to do but vary the current as conditions required. It is argued that by so doing a large percentage of the scrap losses would have been avoided, and uniform product obtained. It is also urged that the Standard Welding Company had usually from three to five of these Parpart machines connected with the same line, the current being thrown on and off at random, and that such operation produced voltage and current conditions which made welding more or less a matter of luck.

Thus it is contended that there is no sound basis upon which to compare the operations of the Standard Welding Company with the disclosure of the Parpart patent. But apparently criticism of the Standard Welding Company's practice in operating the Parpart machine was raised in the Mohegan Case, for Judge Hough writes:

"Why the Parpart machine made tube with so much waste, made it so slowly, and usually left the weakest part of the tube, not in the weld, but alongside of it, is explained by defendant's expert (Mr. Waterman) in his usual admirable style, and we accept it.

Sum of the matter is that the welding heat for Parpart should be uniform, and the upset of metal large, in order to produce a substantially seamless tube, which was what those employing the Parpart machine wanted. The uniformity of heat prevented speed, and the large upset made a large burr; therefore in actual use Parpart's device during its patent life never made tube commercially at more than about 20 feet per minute, and when the burr was removed the waste of metal was large from that cause alone. * * *

"We find no evidence that those who handled the Parpart machines for so long failed to attempt improvements, and to get as good results as they could out of them, nor were they (as revealed by their evidence) apparently unintelligent. Our inference from this is that there was room for invention in respect of electric butt-welding of thin tubular stock after Parpart had told the public all he had to tell.

"Johnston disclosed in 1919 an evident familiarity with Parpart's machine, and a theory of action about thin stock butt-welding of which Parpart evidently had no idea, and which the *excellent practical men* [italics mine], who for many years had worked with those machines, had not hit upon."

In view of this holding by the Circuit Court of Appeals and from the record in this present suit, I cannot find in any respect wherein those who practiced the Parpart invention failed to realize the teaching of Parpart patent, No. 658,741. Moreover, that patent was before the Circuit Court of Appeals, and I must assume, not only the practice of the Standard Welding Company under the patent, but that the patent itself, was fully considered and found wanting.

Do the two Thomson patents, then, which were not in the other case, except as cited in the answer, make out such a "composite disclosure" as to invalidate the Johnston inventions?

Thomson patent, No. 347,140, is for an apparatus for electric welding. Thomson was a pioneer in the art of electric welding. He describes the art as consisting:

"In bringing together with a certain pressure the ends of the wires, bars, etc., to be jointed, in which pressure must be small, and can with my apparatus be regulated at will, and then constituting the abutted ends and a slight portion of the wire or bar on each side of such ends as the path for an electric current of great volume, but not necessarily of an electro-motive force of more than a few

volts (depending on the nature and size of wire or bar). With large bars the current must be much greater than with small bars or wires, and it is well to employ as a source of current a regulable apparatus. Either continuous, intermittent, or alternating currents of electricity may be employed."

Figure 4 of that patent shows wires $W$ $W'$ to be welded. A powerful current passes the abutted ends at $J$. Under certain conditions heat will be formed at $J$ in sufficient amount to fuse the abutted ends, and under slight pressure they will weld over their whole section with a slight projecting burr or expansion. The inventor states (page 2, lines 79–84):

"In this connection it may be remarked that my invention gives a great advantage in permitting the formation of joints without heating the metal to any considerable distance on each side of the joint, so that temper, elasticity, and finish remains uninjured."

It appears that Thomson appreciated the desirability for simultaneous application of pressure to move the pieces to be welded with the application of heavy currents to traverse the joint to be welded. Indeed, claims 2 and 3 of the patent emphasize such simultaneous application of current and pressure.

It may be noted that in this patent Thomson makes no reference to correlation of all of the factors emphasized by Johnston, for obviously there is no stock fed in the Thomson apparatus, nor is there instruction given as to the correlation of contact as distinguished from pressure with the other factors involved.

In patent No. 444,928 Thomson states:

"My present invention consists, essentially, of forming an elongated joint by the electric welding process by feeding the work in the longitudinal direction of the joint through suitable pressure devices, the work being properly arranged, so that the pressure devices will press the surfaces to be welded together and simultaneously passing an electric current through the work at the point of pressure."

Thus in this patent there is the suggestion of feeding the work during the process of welding. In carrying out his invention he states that pressure devices in the form of suitable rolls or segments of rolls are included in the heating electric circuit.

Are the disclosures in these two Thomson patents sufficient, with the disclosure in the Parpart patent, to anticipate the Johnston inventions? Do they meet the invention as defined in the Mohegan Case? Is there indubitably in the composite disclosure such a correlation of factors of heat, rate, pressure, and contact as anticipates Johnston? Is there anything in what Thomson and Parpart separately taught, when gathered together by those skilled in the art, that would have enabled them to do what Johnston did? I do not think so. As a matter of fact I think that Thomson adds nothing to what Parpart discloses. The Parpart machine and operation showed a feeding of the stock; showed how to hold the stock while being welded; showed the passing electric current creating sufficient heat fuse. Thomson taught nothing that Parpart did not avail himself of, save the injunction in the earlier Thomson patent to confine the heating to the particular edges to be fused. Moreover, when one reflects that those engaged in working the Parpart machine for a period of 15 years or more endeavored to overcome its limitations, it must follow that Johnston did something which was certainly not obvious and not merely the result of mechanical skill. Webster Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177; Eibel v. Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523.

There were other prior art patents offered in evidence concerning which testimony was taken, but which, with the exception of the Harmatta patent, No. 1,046,066, are not emphasized. The reference to Harmatta, though, is not really to anticipate the Johnston patents, but rather to urge the decision of the Supreme Court in Thomson Spot Welder Co. v. Ford Motor Co., 265 U. S. 445, 44 S. Ct. 533, 68 L. Ed. 1098. The theory is that there is no more difference between the disclosure of Thomson and that of Johnston than there was between Harmatta and Thomson. The argument adduced is one of seeming, but not real, analogy.

In reaching the conclusion that, even with the added prior art adduced in this trial, the Johnston inventions are valid, I desire to state that I have been in no sense swayed by such evidence as was presented by the plaintiff in respect to the commercial success of the Johnston apparatus, method and product. On the contrary, I gave no consideration whatsoever to that part of the proof, for to argue that invention follows from commercial success is to invite the danger of fallacious inference. Commercial success obviously may result from a multiplicity of causes. Hence to assert with confidence that commercial success bespeaks invention requires that all other causes be eliminated. Thus one ar-

gues necessarily in a circle. McClain v. Ortmayer, 141 U. S. 419, 12 S. Ct. 76, 35 L. Ed. 800; Harvey Hubbell, Inc., v. General Electric Co. (C. C. A.) 267 F. 564.

On the subject of validity there remains for consideration the claims which were not involved in the Mohegan Case. The defendant contends that claims 1 and 2 of patent 1,388,434 are broader in scope than the claims sustained heretofore, and that the Johnston method and invention should not be extended to include them. Claim 1 reads:

"1. An improved process of butt-welding thin-gage tubing, which consists in passing a sheet metal blank of excess diameter through a throat formed by a plurality of rollers grooved to conform in size and shape to the exterior contour of the welded tube and held rigidly against yielding, so as to effect an upsetting of the blank edges and a reduction of the diameter of the blank as it passes through said throat, said rollers collectively embracing and supporting the blank throughout substantially its complete circumference and being arranged so that their line of contact lies in a single plane, causing said blank to progress continuously and steadily through said roller throat and simultaneously passing a current of relatively large amperage across the joint between the edges of the blank being butt-welded, whereby concurrently with the heating and softening of the edges of the blank the latter is swaged and compressed to the size of the roller pass, and welding thereby effected."

Claim 2 is, perhaps, the broader, and reads:

"2. The process of butt-welding thin-gage tubing, which consists in progressively maintaining the edges of a tubular blank in accurate abutting register with each other and progressively, regularly, and at relatively high speed, reducing the size of the tubular blank and upsetting and welding together the edges thereof, by applying a circumferential line of pressure substantially continuous around the blank, except at the welding seam, simultaneously passing a heavy electric current through and across the seam cleft between said abutting edges, localized and chiefly confined to a path coincident with the zone of maximum compression of the blank and regulated to produce a welding heat below a fusing heat in the edges of the blank."

This claim is characterized by the defendant as indefinite and vague, because of the use of the phrase "at relatively high speed," and because the claim in terms is not limited to the particular kind of single shot stitch described in the specification. The former objection seems to me to be more verbal than substantive. For, while it is true that the term "relatively" conveys no information of itself, nevertheless, under the usual rules of construction of patent claims, recourse must be had to the specifications, and, as has been said heretofore in this opinion, Johnston stated what he meant by "relatively high speed." Among those things which he said militated against success in the prior practice was "failure to discover and procure the proper relations between speed of travel of the stock and amount, character, and manner of application of the heating current supply," and his solution is "that the feed rate be sufficiently fast to remove the welded tubing quickly from the influence of the welding current." It cannot be denied that the apparatus which he describes accomplishes that purpose.

The second objection, that the claim should be limited to the particular kind of single shot stitch, presents more difficulty. The Circuit Court of Appeals, in the Mohegan case, said:

"The essential and novel thoughts in that theory [i. e., Johnston's theory of action about thin stock butt-welding] are to proportion and correlate time or speed of movement, heat both as to kind to be applied and area to be heated, contact of butts as to accuracy and pressure as to amount. * * * The resultant of this correlation of forces or elements was and is the stitch seam; a weld line which looks as if it had been sewed—i. e., the 'recurrent' weld of the patent in suit."

The specifications of the patent describe the flow of current as localized to a condemned stream going across the seam cleft. The recurrent effect may be minimized by increasing the current flow and slowing down the rate of travel of the blank, and indeed Johnston asserted that it was not an inevitable concomitant of success. But, whether the recurrent effect must always be the result, it remains true that the welding is produced by a series of electric shots, and that indeed is a necessary condition of the invention.

Now, does claim 2 have any such limitation? The current is spoken of as "a heavy electric current through and across the seam cleft, * * * localized and chiefly confined to a path coincident with the zone of maximum compression of the blank, and regulated to produce a welding heat below a fusing heat in the edges of the blank." In this there is no suggestion of a series of shots. Accordingly the claim is broader than the invention.

The same criticism may be made of claim 1, because that claim describes the current merely as one of "relatively large amperage across the joint between the edges of the blank being butt-welded." It follows that claims 1 and 2 are invalid.

Of the apparatus claims, claim 22 reads as follows:

"22. In an electric butt-welding apparatus, means forming a blank-compression throat, and including roller means to support the blank and roller electrodes arranged to closely straddle the seam and make contact with the metal on each side of the seam throughout a large arc; means for supplying alternating current of given frequency to said electrodes and of voltage and amperage regulated so that each impulse brings only a short length of the extreme edge portion of the blank, compressed in the throat, to approximately fusion temperature; and means for feeding a blank through the welding throat at a speed to present in the welding throat, at the time of each current impulse, a theretofore unfused section of the seam."

This describes a machine which may be operated in accordance with the Johnston method. As has been said, the closest approach in the prior art is the Parpart machine; but the Parpart machine, on the testimony of the witnesses who were most familiar with it, had to be reorganized in order to be operated in accordance with the Johnston method. Was that reorganization an obvious one? The Circuit Court of Appeals wrote: "Johnston disclosed in 1919 an evident familiarity with Parpart's machine, and a theory of action about thin stock butt-welding of which Parpart evidently had no idea, and which the excellent practical men, who for many years had worked with those machines, had not hit upon;" but added, "that Johnston's method can be practiced with Parpart's machine, and what plaintiff now calls infringement was first practiced after men skilled in running Parpart machines got hold of a copy of Johnston's specification, read it, instantly declared they could run a Parpart that way, and did it, after a reorganization not mechanically vital."

It seems to me that every mechanical element found in this claim is present in the Parpart patent, including the means for feeding a blank through the welding throat. Mr. Sessions testified that when the Standard Welding Company changed from its slow speed operation on the Parpart machine to the high speed of Johnston's, in effect all that it did was change the gears to make the machine run faster, and to adjust the relation of the tube blank to the welding throat, so as to get a smaller upset.

Claim 23 is a narrower claim, because it has this limitation: "Each of the electrode grooves encompassing almost 90 degrees of the circumference of said throat, and a third pressure roller, also having a horizontal axis and its peripheral groove encompassing almost 180 degrees of the circumference of said throat."

It was this change which vitally helped Johnston to bring about his correlation of contact with the other factors of the problem. This was not a mere obvious adjustment of the Parpart machine. The defendant replies that there would be no mechanical problem in applying the electrodes, such as are shown in German patent, No. 265,830, to the Parpart patent. But something more was required than mere mechanical knowledge. This particular change in Parpart was absolutely necessary to make possible the carrying out of his theory of correlation. I think, therefore, that, while claim 22 is anticipated by Parpart, claim 23 is not.

There remains for discussion the matter of infringement. The subject is divided into three branches, inasmuch as there are method, product, and apparatus claims involved.

Defendant's machine falls within the limitations of claim 23 of patent No. 1,388,434. It is a machine specifically designed for electric butt-welding. It has means for feeding a tube blank longitudinally through the welding throat; the welding throat is of slightly less sectional area than the cross-section of the tube blank; the throat comprises electrode rollers insulated from each other and having a common horizontal axis, each of the electrode grooves encompassing about 90 degrees of the circumference of the throat; there is a third pressure roller having a horizontal axis and a peripheral groove encompassing about 180 degrees of the circumference of the throat, so that there is substantially complete circumferential pressure in a single plane.

The defendant seeks to avoid infringement, contending that the axis on which the supporting rollers are mounted have been moved forward of the axis of the electrode rolls. The slight distance—one-eighth of an inch—apparently is of no consequence. Certainly infringement is not avoided because the defendant's machine is regulated to operate at 180 cycles. Johnston set no limitation in this regard.

As to process: Just as in Johnston's apparatus, the stock to be welded is fed in the form of a flat strip to the forming rolls, and is transformed into a cylindrical-shaped tube having an open seam, which is presented to the electrodes. By a suitable current of successive impulses the welding is effected. The speed is dependent upon the gear ratio, which varies. It has been testified that the speed used by the defendant is approximately 27, 46, 50, and 60 feet per minute.

The defendant seeks to avoid infringement by showing, among other things, that with the Parpart apparatus and process, if used with 60 cycles at 20 feet per minute, there are 30 heat impulses per inch along the seam, and that, as in Parpart, if on the defendant's machine 180 cycles are used at a speed of 60 feet per minute, there will be 30 heat impulses per inch along the seam. So that, the defendant argues, under those conditions the defendant puts the same number of heat impulses per unit of range across the seam as did the Standard Welding Company, and that therefore the defendant is practicing Parpart's process.

The fallacy involved in the argument is the assumption that Parpart taught the correlation of factors which is the crux of the Johnston invention. Defendant contends that no one knows where the Johnston invention begins, nor how far it goes. It is also argued, within the range of speed used by the defendant, that there is no detectable evidence of any of the Johnston characteristics of stitch welding. I think the answers to both contentions are found in the fact that Johnston put no limit either upon the number of impulses per minute or the rate of speed of the feeding of the stock. I see no reason why there need be any limit established to circumscribe his invention.

Also in respect to visible evidence of the use of the Johnston process, Johnston himself said that the recurrent effect is not an inevitable concomitant of success. In other words, I suppose the mathematical limit of the number of heat impulses per minute is infinity, and the mathematical limit of the rate of travel of the stock is infinity, and that under such limits there would be a continuous weld, and not a stitchlike weld. But, short of infinity, any practical application must produce certain irregularities of texture, more or less visible or discernible, depending upon the rate of impulse and rate of speed.

The plaintiff, in addition to pointing out the hills and dales in certain of defendant's exhibits, visible to the eye, produced as to others photomicrographs of the welded structure. As might be expected in a case so highly technical, the experts differed in the interpretation of those photomicrographs. Despite the acknowledged learning and high position of Professor Sauveur, it would seem to me that plaintiff's experts, Mr. Adelson and Professor Boylston, expressed the more reasonable view.

■ Selecting, perhaps, almost at random any of the process and product claims sustained in the Mohegan litigation, we find the defendant falls within the limitation of those claims. For example, take claim 5. The defendant's method compresses the seam walls into abutting contact; the defendant employs an alternating welding current of suitable amperage to flow across the seam between electrodes, effecting a relative traverse of the tubes and electrodes at such rate as to bring about a material fluctuation in the temperature of the seam at the moment of welding, the fluctuations synchronizing with the alterations of the welding current.

Claim 3 of the product patent describes an article of manufacture being of a thin-walled electrically butt-welded steel tubing, the abutting walls united by a substantially continuous weld presenting recurrent variations in metal texture in closely adjacent narrow zones synchronizing with varying applications of welding current. I think that describes the defendant's product.

In conclusion, I desire to say that I most carefully considered the testimony of Professor Adams in all its aspects. In particular, consideration was given to his theory, as illustrated in Defendant's Exhibits N, O, and P, that in defendant's process the welds are produced by a cumulation of a plurality of diffused shots, and not by a single impulse, nor by a single condensed shot. However, it appears that the study of curves presented by him is based, not on any actual practical measurements, but upon assumptions arbitrarily made. He said:

"It is obviously impossible to apply a measuring instrument to determine these current distributions in a welding machine of this type in operation. But current follows certain definite laws, Mr. Edmonds, and the current flow as plotted here was plotted on the assumptions which I made, and so stated very clearly, namely, that this seam cleft line, the base line of the figure in Exhibit N, was an equipotential line. Now, I would like to tell you what effect the actual practical conditions have upon that distribution. If you imagine along this seam cleft a uniform high

resistance, the resistance of the seam cleft is, we know, higher than the resistance of a given portion, the same portion, of iron. There is quite high resistance, even when the pressure is very great closing the seams. That is the condition on the left side to the point where there is an actual welding bond. Beyond that point this welding bond has obliterated the existence of the seam cleft as a mechanical joint, but there is there a layer of very hot metal, and that very hot metal has a resistance which at welding temperatures is approximately ten times the resistance at room temperatures; so you have a high resistance joint on the right of the welded portion, and you have a high resistance portion on the left of it again. The effect of that high resistance joint in both cases is to cause more spreading than I have shown."

Plaintiff calls attention also to the highly theoretical assumption in respect to the character of the contact which Professor Adams made with regard to the welded tube. Mr. R. C. Sessions, testifying as to the shape and extent of the area of contact of the electrodes upon the tube in defendant's machine, said:

"The area of electrode contact with the tube varies somewhat, depending on the shape of the groove of the electrode and the shape of the tube as it approaches the electrode and as it passes under the electrode. It is in every case, however, quite an appreciable area. It is much more than a mere line contact. I have figured these areas out for different conditions graphically, and have also on numerous occasions during the past several years actually treated the surface of a tube; that is, by treating it with copper sulphate, which leaves a thin deposit of copper on the tube, or bluing the tube with a substance such as Prussian blue, and then passing the tube, moving the tube, so that that point which has been so treated is under the electrodes, stopping the tube, and rotating the electrode slightly by hand, so that the contact area, or point at which the electrode is contacting the surface, where the electrode is contacting with the tube, is marked on this blued or coppered surface, in order to determine what the area is with which the electrode contacts with the tube.

" * * * Yes, the area is elongated in the direction of the length of the tube a distance varying anywhere from three-eighths of an inch to five-eighths or even three-fourths of an inch. * * * The theoretical area of contact of the electrode with the tube varies somewhat with the angle in which the electrodes lie, or the plane in which the electrodes lie; that is, vertical electrodes as shown in the Johnston patent under given conditions will have a certain area of contact, and horizontal electrodes will go to another extreme as to area of contact, or shape of that contact, in a theoretical figuring of this area. In practice, however, the actual area is much the same, and is extended longitudinally of the tube for quite a considerable distance at the point immediately or nearest the seam of the tube."

Moreover, Mr. Sessions affirmed that the area would vary with the pressure of the electrode rolls on the tube. The exhibit which Mr. R. G. Sessions introduced (Plaintiff's Exhibit 61) illustrates a typical form of contact of the electrode with the tube, both as to area and extent of elongation.

Therefore I am of the opinion that, despite the extremely ingenious and able presentation made by Professor Adams, he does not succeed in proving that the defendant's process is a cumulation of a plurality of fused shots rather than a single condensed shot. Incidentally it may be noted that Professor Adams, prior to the litigation, in his article "Welding of Iron and Steel," which he wrote for the American Iron and Steel Institute in 1926, gave high indorsement to the Johnston method (without naming it, however, as such). He said:

"Tube Welding.—Several hundred thousand feet of steel tubing are made every day by the resistance welding of the edges of steel strip rolled up to form a tube. A single machine will take the flat strip, shape and weld it at a rate of from 60 to 150 feet per minute. At these high speeds the fusion is confined to a thin surface layer and the flash or upset is hardly perceptible. With alternating current of standard frequency (60 cycles per second) the very high speeds result in an intermittent weld, since the heat is proportional to the square of the current and varies from zero to a maximum and back to zero, during each half cycle. This gives the appearance of a stitch on the outside of the tube, hence the common name of stitch weld. At a speed of 120 feet per minute (and 60 cycles) the stitches would be one-fifth of an inch apart."

"For many mechanical applications such as bedstead tubing, the intermittent characteristic is not objectionable. Moreover, with a somewhat slower speed or higher frequency of current supply, the weld can be made continuous and airtight. No other process of tube manufacture can compete with this on the basis of cost."

Plaintiff may have a decree in accordance with the opinion.