**STEEL & TUBES, Inc., v. CLAYTON MARK & CO.**

No. 1061.

District Court, D. Delaware.

July 30, 1937.

Howard Duane, of Wilmington, Del., and Drury W. Cooper and Ernest D. Given (of Cooper, Kerr & Dunham), all of New York City, for plaintiff.

Arthur G. Logan and Josiah Marvel, Jr. (of Marvel, Morford, Ward & Logan), all of Wilmington, Del., Clarence D. Kerr and Charles H. Walker (of Fish, Richardson & Neave), all of New York City, and Walter J. Blenko (of Stebbins, Blenko & Parmelee), all of Pittsburgh, Pa., for defendant.

NIELDS, District Judge.

This is a patent infringement suit of Steel & Tubes, Inc., plaintiff against Clayton Mark & Co., defendant. The bill of complaint charges defendant with infringement of two letters patent.

1. Patent No. 1,388,434, granted August 23, 1921, to Gustav V. Johnston for "Method & Apparatus for Butt-Welding Thin-Gage Tubing," with claims 1 and 2 in suit.

2. Patent No. 1,611,875, granted December 28, 1926, to Harry Belmont for "Welding Apparatus" with claims 1 and 2 in suit.

Johnston patent, No. 1,388,434, has been repeatedly held valid and infringed. (See footnote 1.) Belmont patent, No. 1,-611,875, has been found valid and infringed. (See footnote 2.) Johnston patent relates to the production of tubing by curving up a flat strip to the form of a tube having a lengthwise seam and welding the same in a particular manner. Belmont provides an apparatus which rolls the welded seam as it comes from the welding machine to improve the texture of the metal in the seam and make the tube perfectly smooth inside and out. The result of the method of welding and the seam rolling is a tubular steel product perfectly welded, which has the same wall thickness through the seam as through any other part of the tube.

History of the Art.

Electric resistance welding started in 1886. Its invention is credited to Elihu Thomson, one of the founders of General Electric Company. Application of electric resistance welding to the manufacture of tubing occurred in 1898. In that year a welding machine was devised by Parpart. The Parpart machine was for many years used in the manufacture of steel tubing.

About 1917 Johnston devised and improved the process of manufacturing tubing by electric resistance. The new process provided a way of producing at high speed better than any then in existence. Parpart had many disadvantages, among them being a limitation of speed to a maximum of about 20 feet per minute. Johnston made it possible to run at high speeds. He says: "The high rate of travel of the material being welded renders the process extremely economical and desirable. By way of example, on .025-inch gage stock, one inch tube diameter, with voltage and amperage as hereinbefore indicated for that gage, I have commercially produced tubing at about 70 feet per minute, and under proper current changes at higher rates. The extremely limited extent to which the blank is heated, both in the matter of temperature and actual amount of metal heated enough to modify its character, results in producing a product of very high grade and uniformity. The process has opened up a very large field of commercial welding heretofore not practised."

High speed is a very important advantage of Johnston. By his method one machine will produce from 5 to 10 times as much as an old one. This is a real attainment. Of even greater importance was the perfection of the tubing which Johnston's method made possible and the economy with which it could be produced. The weld is so good that the tube can be worked, distorted, and shaped in various ways while the metal is cold. The small burr can be rolled down or cut off as the tube comes from the welding machine. Parpart had a large burr outside and inside the tube, involving a costly process of removal by numerous handlings not connected with the welding machine.

[1] National Tube Co. v. Steel & Tubes (C.C.A.1937) 90 F.(2d) 52, 55; Steel & Tubes v. National Tube Co. (D.C.1935) 11 F. Supp 766; General Tube Co. v. Steel & Tubes (C.C.A.1932) 61 F.(2d) 475; Steel & Tubes, Inc. v. General Tube Co. (D.C.1931) (not reported); Steel & Tubes v. S. Jackson Tube Co. (D.C.1930) 42 F.(2d) 760; Steel and Tubes, Inc., v. Greenpoint Metallic Bed Co. (D.C. 1929) 37 F.(2d) 172; Elyria Iron & Steel Co. v. Mohegan Tube Co. (C.C.A.1925) 7 F.(2d) 827; Elyria Iron & Steel Co. v. Mohigan Tube Co. (D.C.1923) (not reported).

[2] National Tube Co. v. Steel & Tubes, supra; Steel & Tubes v. National Tube Co., supra; Steel & Tubes v. S. Jackson Tube Co. supra.

Johnston's method of welding tubing is the only electrical resistance method in use today. Parpart disappeared years ago. Plaintiff's Cleveland plant is producing about 3 million feet of Johnston tubing per month; its Brooklyn plant between 3 million and 4 million feet per month and its Detroit plant about 1 million feet per month, or a total of between 7 and 8 million feet per month. Johnston's tubing may be subjected to corrosion, high pressures, and severe strain. Boiler tubes, condenser tubes for oil distillation, automobile drive-shafts, and furniture are a few of the uses. The total amount of Johnston tubing made and shipped by the plaintiff from 1921 to June 1936 was about 775 million feet.

## The Johnston Method.

In the Johnston method only the extreme edges of the tube blank are heated to the welding temperature. The tube is subjected to enough pressure to force the contacting faces at the two seam edges firmly together. Owing to the fact that the heat is confined to the edges, only a small burr of metal is formed. The Parpart method heated the metal some distance back from the seam edges. When the pressure was applied, the metal which had been overheated and damaged along the edges was pushed out as an incident to joining in a weld the body metal of the tube. Consequently there is a considerable burr at the seam both on the inside and outside of the tube. The difference between the two burrs arises from a different correlation in Parpart and Johnston.

Johnston devised and employed a new correlation of three variable items: Current, meaning the heating of the metal; speed, meaning the period of time during which the metal is subjected to the heating effect; and pressure, meaning the force applied to press together the seam edges. Johnston subjected the contacting seam edges to a pressure sufficient to unite them without expelling more than a negligible amount of the heated metal. Johnston practiced his method with a machine in structure like the Parpart machine. In both there are electrode rolls for conducting the current to and from the tube, one or more pressure rolls underlying the electrode rolls, feeding rolls in advance of the electrode and pressure rolls and take-off rolls in the rear of the electrode pressure rolls. With Johnston there was a new idea underlying the relation and use of these elements. That idea involved the use of a blank of less width than Parpart's. Johnston used a flat blank having a width equal to the circumference of the desired tube plus the thickness of the metal. Whereas Parpart used a blank having a width equal to the circumference of the desired tube plus three or more times the thickness of the metal.

## Johnston Patent.

In his patent No. 1,388,434, Johnston says that in order to weld tubing according to his idea it is necessary "so to correlate the factors of stock feeding-rate, current control, and pressure application, that high speed of stock travel is made an advantageous primary condition that minimizes or obviates many heretofore existing difficulties. * * *"

(1) As to speed or stock feeding-rate he says: "I have commercially produced tubing at about 70 feet per minute, and under proper current changes at higher rates."

(2) As to heat or current control, Johnston does not limit himself to any particular regulating mechanism. He gives details as to how to control his current to give the best result when he says: "successful results are obtained by so applying and controlling the current that the extreme edges only—practically the edge surfaces only—of the thin stock are brought to a temperature approximating the fusing point (and possibly reaching that point) while the contiguous portions are not heated high enough to render them soft and mushy."

(3) Pressure Johnston considered the third element of his correlation: "the size of the throat should be sufficiently less than the external size of the tube blank passing therethrough to insure a pronounced compression and upsetting or mashing together of the edges of the blank at the time of welding but only, in the best practice, to a degree producing but a small burr accordant with the restriction of the greatest softening effect substantially to the lips of the seam-cleft."

And further: "while to provide good electrical contact between the abutting edges of the tube blank and between the tube-blank surfaces and the electrodes, the size of the throat should be sufficiently less" etc.

This correlation of speed, heat, and pressure was the heart of Johnston's inven-

tion. That correlation did not exist in Par-part. Johnston's disclosure revolutionized the art of manufacturing tubing.

Johnston said of his electrical current: "Fourthly; that the electric current supply be approximately uniform; so far as I am at present advised, it should best be alternating current (I prefer to use 60 cycle current), and for welding tubing of .025 gage the apparent current should be about 12,000 amperes at an apparent voltage of approximately 1.5 volts, as measured across the insulated gap of the roller-electrodes at the nearest accessible point to their points of contact with the tube being welded. * * *"

This is the only reference anywhere in the patent to the kind of current preferred. Defendant takes the position that this statement of preference constitutes a limitation excluding all other kinds of current. As defendant uses a current not specifically mentioned in the patent, it contends the patent is avoided. Defendant ignores the fact that Johnston does not exclude direct current. Every element of Johnston's correlation of speed, heat, and pressure is employed by defendant to produce tubing having every characteristic of the Johnston patent.

### Infringement.

Defendant relies upon two things: First, that it uses direct current to effect its welding. It contends that Johnston is limited to the use of alternating current. Second, that defendant uses a seam spreader and bows its tube 1/32 of an inch to 3/64 of an inch midway of a section 5½ feet long of the tube progressing through the machine. There is no showing that this bowing is necessary or that defendant cannot weld without it.

Defendant has appropriated every advantage of Johnston: (1) The edge surface weld; (2) the high speed made possible by the edge surface weld; (3) the small soft burr and consequent ease of removal; (4) the low manufacturing cost as compared with anything before Johnston.

In defendant's machine the strip is gradually turned from flat into a tube by six sets of rollers. The tube leaves the last set in circular form but with the edges held apart by a seam guide fin which lines up the open seam cleft with the electrodes. The pressure rolls and electrodes are mounted on the same axes and are so constructed as to form the circular "Welding Throat" in which the tube edges are heated and welded together. After leaving the "Welding Throat," the tube passes through "Tube Guide Rolls." The tube then engages a knife which scrapes off the outer burr. Following the burr cutting knife is the "Finishing and Straightening" section which straightens the tube and reduces it to the desired finished size. Defendant raises the electrodes and pressure rolls by turning the "Vertical Adjusting Screw" so that the bottom of the "Welding Throat" is slightly above the horizontal line. The amount of elevation is a trivial one. It has the effect of bowing the tube. This bowing is comparable with the effort made by Greenpoint to avoid infringment by using high frequency current and low speed. It is also comparable with the attempt of the Jackson Company to avoid infringement by imperfect butting of the edges and then rolling them into alignment with the Belmont mandrel. Defendant also says by raising the throat 3/64 of an inch it is able to use a blank smaller than the welding throat; that by having a seam spreader and guide thick enough it is able to make a weld by some sort of a leverage in the welding throat. However, proofs definitely show that defendant's "Welding Throat" is always smaller than the tube blank.

In defendant's apparatus there is a regulation of the welding current by the hand wheel and connections. There is a regulation of speed by the interchangeable speed gears. The pressure regulation is effected by the two screw adjustments marked electrode and pressure roll welding throat adjusting screw. These adjustments are all used in setting up the machine for operation and can be operated while welding is being carried on to make any necessary changes.

The only purpose of an electric current in electric welding is to supply the necessary heat. Thomson said that either direct current or alternating current might be used for this purpose. While Thomson established the equivalency of the two kinds of current in electric welding, it is not the law that an equivalent must be something known at the date of plaintiff's patent. The law recognizes that even later devised improvements may infringe. In Tilghman v. Proctor, 102 U.S. 707, 730, 26 L.Ed. 279, the apparatus used by the infringer was totally unlike the apparatus shown in the patent and the process used by the infringer differed from the patented

process in several particulars. The infringer had, however, obtained all of the advantages of the patent, and the differences which existed were held not sufficient to avoid infringement. In practically every issue of infringment decided by the courts in favor of plaintiff, the offending machine or process was devised (and sometimes patented) by defendant after the issuance of plaintiff's patent.

Johnston did not limit himself to either kind and so did not confine himself to either. The Circuit Court of Appeals for the Third Circuit, National Tube Co. v. Steel & Tubes, supra, has dealt with this precise matter. Judge Davis says: "The patent, however, does not limit itself to alternating current, but merely indicates a preference for it. On page 3 of the specification it is stated that 'the electric current supply be approximately uniform; so far as I am at present advised it should best be alternating current. * * *' Neither claim 1 or 2 specified that either direct or alternating current should be used. Claim 1 says: 'simultaneously passing a current of relatively large amperage across the joint,' and claim 2 says: 'passing a heavy electric current through and across the seam cleft.' * * * Since the defendant used the Johnston correlation of speed, current, and pressure in the direct current operations, and since the Johnston method patent does not limit its application to the use of alternating current, the District Court was correct in finding that claims 1 and 2 of the Johnston method patent were infringed."

Defendant relies upon its adjustment of the welding throat from 1/32 of an inch to 3/64 of an inch above the line of the forming rolls and the sizing and reducing rolls, the adustment of its spreader roll with the alleged "leverage" action, including sending the tubing through the welding throat at a slight angle and upon conflicting testimony about where the heat starts. If defendant's contentions are accepted at their face, claims 1 and 2 of the Johnston patent are still infringed. Plaintiff's expert discussed these claims in detail, element for element:

"Q. 49. Now, assuming that defendant's practice has at some time been conducted commercially, as defendant's witnesses have testified, and not as Mr. Judd has testified, what have you to say as to a comparison between that practice or process and the Johnston process, as disclosed in his patent and claimed in Claims 1 and 2?

"A. The Johnston process as defined in Claims 1 and 2, calls for acting upon a sheet metal blank in certain sequences of operation.

"Q. 50. I will ask you in considering this, to take into account also the disclaimer.

"A. Mr. Waterman has discussed the claims and compared the elements with what he finds in defendant's process. Claim 1 of Johnston, calls for first passing a sheet metal blank of excess diameter through a throat formed by a plurality of rollers grooved to conform in size and shape to the exterior contour of the welded tube.

"Now, Mr. Waterman seems to assume that the throat of the Johnston patent is a hole through a mathematical plane. Such I do not consider to be the case. The throat is the tunnel or passage between the rolls, and is not limited to the plane which joins the center lines of the axes of the rolls, or to any other mathematical plane.

"According to the Johnston patent, Claim 1, a sheet metal blank of excess diameter is passed through a throat formed by a plurality of rollers.

"Now, if that sheet metal blank be passed through the throat at a line at right angles to the plane which joins the center lines of the rollers, then if the blank be of larger diameter than the smallest diameter of the throat, it could not pass through without being contracted in circumference.

"Now, if we take a tube of smaller diameter than the welding throat, which is the condition in which some of defendant's witnesses have testified exists in the carrying out of the defendant's process, and attempt to put it straight through the throat, on a line at right angles to the plane joining the centers of the electrode rolls, it is obvious that it would pass through freely; but as soon as we tip that tube in the manner which defendants claim to do, which the witnesses of the defendants have testified that they do, then it obviously contacts with it, and the electrode throat presses against the wall of the tube to force the seam edges together just as though the throat were actually of smaller diameter.

"When we put the tube through at an angle to the plane, it is virtually passing through a smaller throat. The effective size of the throat is reduced, and such a

throat responds to the definition given in Claim 1 as 'passing a sheet metal blank of excess diameter through a throat formed by a plurality of rollers grooved to conform in size and shape to the exterior contour of the welded tube.' * * * In either case, whether the tube be inclined to the throat and be smaller than the throat or be perpendicular to the throat and be larger than the throat, it is necessary that the tube be in contact with the walls of the throat, both with electrodes and with the pressure rolls because there must be pressure between the electrodes and the tube in order that current may be conducted from the electrodes to the tube; there must be pressure between the edges of the tube in order that current may be conducted across the edges of the tube; and there must be sufficient total pressure of the throat upon the tube to force the edges together with sufficient pressure to cause them to coalesce and complete the weld.

"The Court: When you say the same kind of pressure is exerted, you simply mean that pressure is exerted?

"The Witness: Yes, and it is circumferential pressure on the tube. It is exerted from the sides of the tube all the way around it tending to contract the girth of the tube and make the tube smaller. The pressure is withstood by the electrodes on the tube, the seam edges of the tube and the pressure rolls on the tube.

"Q. 54. The next phrase in the claim is 'and held rigidly against yielding.' To what does that refer in the claim?

"A. That refers to the holding of the pressures substantially constant during the passage of the tube through them. If there were yielding of the rolls, the tube would expand and vary and cause the pressure between the seam edges to change, or if they were yielding in the other direction, it would cause the tube to contract, and the result would be an effect upon the quality of the weld.

"So this expression 'held rigidly against yielding', means that the tube must be subjected to uniform forces as far as possible during its passage through the welding throat.

"Q. 55. The next phrase in Claim 1 is 'so as to effect an upsetting of the blank edges and a reduction of the diameter of the blank as it passes through said throat.' Is that applicable to the defendant's prac-

tice if it be as the defendant's witnesses say?

"A. Yes, for the reason that this pressure is exerted before, as and after the tube passes the line connecting the centers of the rolls, and even though the tube edges be not in contact until they have travelled ⅛ or ¼ of an inch beyond the central plane of the electrodes, it is the holding of the tube rigidly against change in pressure, passing it through the throat, that causes the upsetting of the blank edges and a reduction in diameter as it passes through the throat.

"Defendant's witnesses have testified that the spreader which is located eight or ten inches away from the central plane of the throat acts like a force exerted upon the edges of the tube, to spread them apart and that the throat acts as a fulcrum for the levers formed by the edges of the tube.

"It seems to me entirely wrong to assume that the throat has nothing whatever to do with the pressing of the edges together and attribute all of that work to the spreader which presses the edges apart.

"If there were no throat or welding pass present in the machine, then it might well be that the edges would not come together until the tube had travelled a long distance, but with the throat there, the edges are bound to come together and we might just as well say that the welding throat is used to press those edges together as a lever of the second class as that the other spreads them apart here. There is no justification for saying that the throat does not cause the edges to come together.

"Q. 56. The claim proceeds:

" 'said rollers collectively embracing and supporting the blank throughout substantially its complete circumference and being arranged so that their line of contact lies in a single plane.'

"Is that applicable to the defendant?

"A. Yes. In every one of these Exhibits RRRR, RRRR-1, RRRR-2, RRRR-3, RRRR-4 and RRRR-5, the line of contact completely encircles the blank which proves that the rollers collectively embrace and support the blank through its complete circumference.

"Q. 57. So that the line of contact lies in a single plane?

"A. Yes, I am coming to that. The line of contact lies in a single plane. Of course, it is not a mathematical line, but

you can put a plane at right angles to the tube through the center line of the electrodes and its cuts the line of contact everywhere, or you can put it through on an inclination which the defendant's witnesses have testified to as to the plane of the welding throat, and it cuts the line of contact everywhere.

"There is an opening at the bottom of the tube where the pressure rolls are separated and there are openings between the electrode rolls and the pressure rolls which break up the continuity of the line of pressure in exactly the way that this claim contemplates where the claim says 'supporting the blank throughout substantially its complete circumference.'

"Q. 58. The claim proceeds 'causing said blank to progress continuously and steadily through said roller throat and simultaneously passing a current of relatively large amperage across the joint between the edges of the blank being butt-welded.' Is that applicable to the defendant?

"A. Yes. The tube is caused to progress through the defendant's machine by the forces exerted upon it by the forming rollers just as steadily as any mechanical drive can be made to feed the tube through.

"It is fed through the welding throat or the roller throat at that uniform speed and simultaneously while the tube is going through the roller throat, current of relatively large amperage is passed across the joint between the edges of the blank being butt-welded.

"The current will pass across the joint wherever the edges of the joint are in contact, and the greatest proportion of the current will flow through that part of the path between the electrodes which has the least resistance. The pressure of the electrodes upon the tube has its effect upon the resistance of the contact between the electrodes and the tube. Where there is great pressure exerted there will be less resistance than where there is lighter pressure exerted.

"In the same way, the resistance of the seam edges to the passage of current across them depends upon the pressure with which the seam edges are pressed together, the resistance being greater where there is light pressure and less where there is great pressure.

"When these electrodes are pressing upon the tube in the manner in which they clearly appear to press in the defendant's Exhibits RRRR to RRRR-4, inclusive, the greatest pressure is just about opposite the center lines or the scribe mark upon the tube representing the center line joining the axes of the electrodes. This means that either at that point or somewhere before that point or somewhere a little later in the travel of the tube, the seam edges will first come together, and where those seam edges first come together will be the shortest path between the points of contact between the electrodes and the tube. Through that path current will flow in large volume.

"So that in my opinion the weld is made substantially at the point where the tube edges first come together, but in any event, the current is passed across the seam simultaneously with the exertion of pressure, 'whereby concurrently with the heating and softening of the edges of the blank the latter is swaged and compressed to the size of the roller-pass, and welding thereby effected.' I have read what follows your last quotation.

"The edges of the blank are swaged and compressed to the size of the effective roller pass, whether it be the size of the pass at the central plane of the rolls or whether it be a little after or before it, it will be there swaged and compressed and the welding there effected.

"Q. 59. Does the claim specify that the current passes only at the line of the narrowest pass between the electrodes?

"A. No, there is nothing whatever in this claim to that effect. I note that Mr. Waterman a number of times said that in the defendant's machine the welding was not effected at the center of the electrodes and that the maximum temperature was not arrived at at that plane, but there is nothing in these claims or in the teachings of the Johnston patent to so limit the heating or welding of the tube.

"Q. 60. With reference to the disclaimer as limiting the claim and as still applicable to the defendant's practice, it says that the heavy electric current passing between the abutting edges to be welded is localized to a condensed stream going across the seam cleft. Is that applicable to the defendant?

"A. Yes. There is no question but what there is great concentration of current at the welding throat and that the heat developed is very intense in a very small area

or pace in the tube that is passing. Otherwise, the weld would not occur.

"Q. 61. The disclaimer proceeds:

" 'and in which the welding heat is produced in the edges only of the blank to form the weld at those edges and raise only a small burr.'

"Is that applicable to the defendant?

"A. Yes. The burrs on the defendant's tube that I have examined, are small. The inner burr is in every tube that I have examined, so small that it is hardly noticeable. One can feel it with his finger, or can observe it by looking through the tube. The outer burr is larger than the inner burr but either by itself or when both burrs are considered together, the burrs formed upon the defendant's tubes are small burrs, such as contemplated in the Johnston patent.

"Q. 62. Now, I will ask you to consider Claim 2, and state whether there is anything in that which requires any more comment than you have given to Claim 1, except the last three lines about 'regulated to produce a welding heat below a fusing heat in the edges of the blank.' If you have any other comment except in that last phrase, will you make it?

"A. The only other point I would like to mention is Mr. Waterman's discussion of the first element of the claim, which consists in 'progressively maintaining the edges of a tubular blank in accurate abutting register with each other.'

"Mr. Waterman seemed to have difficulty in understanding whether that meant from the time the tube was formed, or during its forming and on the way through.

"Obviously as the Johnston patent uses a spreader and seam guide, the edges can not be in abutting register until they arrive at some place where they press together. They are separate when they go over the seam guide or spreader, and this element 'maintaining the edges of a tubular blank in accurate abutting register,' refers only to the time when they are passing through the welding throat to be welded.

"Now, as to the last three lines, 'passing a heavy electric current through and across the seam cleft between said abutting edges, localized and chiefly confined to a path coincident with the zone of maximum compression of the blank and regulated to produce a welding heat below a fusing heat in the edges of the blank.'

"That refers, I believe, to the prevention of overheating of the tube to such an extent that the metal would drop out of the seam, or would be so soft and mushy that it would not make a weld. If, for any reason during the carrying out of a progressive seam welding process, the relative movement of the work to the electrodes, that is the relative movement of the work relative to the electrodes, be stopped, instantly, the electric current would burn a hole through the tube and cause the metal to drop out. That is real fusing of the metal; and such a condition is not desirable, and I believe it is what is contemplated in this last element of the claim."

It is clear that the two claims in suit are infringed no matter whether the adjustment of defendant's electrodes was used or whether defendant's throats are in horizontal alignment.

### Johnston Patent Not Anticipated.

Of the patented art relied upon by the defendant only Peyton patent, No. 217,141, and the Higgin patent, No. 1,052,820, were not before the courts in the other cases. The Peyton patent is for a machine for the manufacture of metal tubes. Peyton does not show any apparatus for heating the material. His idea was to take skelp which had been heated to a welding temperature and then pull it through the welding throat shown in his patent so as to force the hot edges together. The entire skelp is heated. Obviously Peyton has no relevancy to the method disclosed by Johnston. Higgin patent is for brazing tubing in the nature of a soldering operation. The Higgin machine would not be suitable for electrically welding tubing. There would be as much metal heated on the underside of the tube as at the seam. It is clear defendant did not base its practice upon either Peyton or Higgin.

The John Wood Manufacturing Company use and the article in American Machinist describing that use do not anticipate or disclose the method of Johnston. None of the other prior patents and publications offered in evidence by defendant discloses the Johnston process.

### Estoppel.

There is nothing in the law that prohibits a patent owner from standing on specific claims in one case and on broader

claims in a later case. That is what plaintiff is doing here: "Similar language is used in Lehigh Valley Railroad Company v. Mellon, 104 U.S. 112 [26 L.Ed. 639], in reference to a patented locomotive wheel. In Masury v. Anderson, 11 Blatchf. 162, 165 [Fed.Cas.No.9270], it was said by Mr. Justice Blatchford: 'The rights of the plaintiff depend upon the claim in his patent, according to its proper construction, and not upon what he may erroneously suppose it covers. If at one time he insists on too much, and at another on too little, he does not thereby work any prejudice to the rights actually secured to him.' Other cases to the same effect are Merrill v. Yeomans, 94 U.S. 568 [24 L.Ed. 235]; Burns v. Meyer, 100 U.S. 671 [25 L.Ed. 738]; and Sutter v. Robinson, 119 U.S. 530, 7 S.Ct. 376 [30 L.Ed. 492]." McClain v. Ortmayer, 141 U.S. 419, 424, 12 S.Ct. 76, 78, 35 L.Ed. 800.

### Disclaimer.

The disclaimer followed seasonably after decision of Judge Galston in the Greenpoint Case. He held claims 1, 2, and 22 of Johnston's method patent invalid because too broad. His opinion was filed on December 31, 1929. An interlocutory decree was entered on January 31, 1930. The disclaimer was made on February 24, 1930. The patent with the disclaimer came again before Judge Galston in the Jackson Case. His opinion filed on July 24, 1930, does not discuss the validity of the patent as affected by the disclaimer. Later, the validity of the patent after disclaimer was challenged on both of the grounds now advanced by this defendant before the Court of Appeals for the Third Circuit. Judge Davis said:

"The defendant contends that the Johnston patent is invalid because of his failure to file a disclaimer within the proper period of time after claims 1, 2, and 22 of Johnston, No. 1,388,434 were held invalid in Steel and Tubes, Inc., v. Greenpoint Metallic Bed Co., Inc. (D.C.) 37 F.(2d) 172. On January 31, 1930, the court entered an interlocutory decree holding the claims invalid; the plaintiff filed a disclaimer on February 24, 1930; three days later the court entered the final decree; and the plaintiff took no further action in regard to the invalid claims. The defendant contends that the plaintiff should have filed a second disclaimer within 30 days of the final decree. Ensten v. Simon Ascher &

Company (C.C.A.) 38 F.(2d) 71, judgment affirmed in 282 U.S. 445, 51 S.Ct. 207, 75 L.Ed. 453. The plaintiff disclaimed as required by the law. Defendant's argument has no merit." Steel & Tubes v. General Tube Co. (C.C.A.) 61 F.(2d) 475, 477.

While the court did not refer specifically to the questions of sufficiency and propriety of the disclaimer under the statute (35 U.S.C.A. § 65), those additional phases had been put before it for consideration. The legal inference is that it passed upon them. The defendant petitioned for writ of certiorari which was denied.

What the disclaimer did was to localize the electric current to a condensed stream going across the seam cleft and in which the welding heat is produced in the edges only of the blank to form the welding at these edges and to throw up the small burr. This was of the essence of the invention as declared in the specification and there was no illegality in disclaiming all else. Judge Hough said: "The contention that Fleming's patent, whatever its original merit or lack thereof, was voided by an unlawful disclaimer, is without substance. The mistake (if there was one) was in claiming something not needed, and the disclaimer abandoned what was not wanted, without broadening or enlarging any claim; it also left the claims fully supported by the original specification. No injury to defendant, or any one else, is shown. The procedure is within Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 22 S.Ct. 698, 46 L.Ed. 968, and our former decisions in Simplex, etc., Co. v. Pressed Steel Co., 189 F. 70, 110 C.C.A. 634, and Strause, etc., Co. v. Crane Co., 235 F. [126] at page 129, 148 C.C.A. 620." Marconi Wireless T. Co. v. De Forest Radio T. & T. Co. (C.C.A.) 243 F. 560, 565.

Defendant's contention as to invalidity growing out of the disclaimer is without merit.

What Judge Davis said in the General Tube Case after reviewing all of the prior art there presented applies here:

"The commercial development of electrically welded metal tubing had advanced no nearer than Parpart. Edge-welding had been suggested; likewise, the type of current used and method of applying pressure. But we do not find an approach to Johnston's combination of the elements of heat,

pressure, and speed resulting in a commercially successful product in spite of the number of years of experiment between Parpart's invention and that of Johnston. The fact that Johnston immediately attained success, that his patent has often been involved in litigation, and that during a long period in which the Parpart machine was operated by those skilled in the art of welding without conceiving the process which the defendant admits can be practiced on Parpart's machine by simple re-organization, leaves small doubt that Johnston's useful and practical disclosure involves invention. * * *

"We have endeavored to explain that Johnston obtains his peculiar edge-weld by properly applying the variable factors of heating current, the length of time of application of the current, and pressure. Each of these factors is variable and, while independent in themselves, are interdependent in the practice of the invention. It follows that the patents are valid at all speeds and infringed."

## Belmont Patent.

■ The purpose of the Belmont apparatus is to smooth the seam inside and out immediately after the electric welding has been done and as a part of the same operation. As a result, any metal which has been expelled during welding may be restored to the seam and no irregularities of wall thickness remain along the seam after the rolling operation is completed. Hence all of the metal of the original strip may be in the tube as completed.

The Belmont invention accomplishes this as fast as the welding machine can be operated and does it most economically and easily. The economy arises from the fact that no handling of the tube after welding to remove the burr is necessary and there is no loss of material because of burr removal.

Since the Belmont invention is designed to be and is used with electrically welded tubing and operates upon the seam before it is cold, one cannot consider the invention simply as a mandrel. The invention involves a group of elements which heat the tube, press the edges together and weld them, as well as the rollers, the carriage, etc., which operate upon the weld after it has been made. Except for perfecting the weld and smoothing it down, the rollers would have no purpose in Belmont's invention. The issue is whether or not the results achieved by the Belmont invention are such as to make a new combination of old elements patentable.

As to the validity of the Belmont patent Judge Davis says:

"The last patent involved in this case is the Belmont patent, No. 1,611,875. This patent 'has to do primarily with the smoothing out of the weld so as to obliterate any burrs that may have resulted from the welding operation.' The aim of the patent is achieved by passing the newly welded seam, while still hot, between 'a pair of rolling elements' having 'relatively fixed axes.' These rolling elements, one 'being inside the tube * * * and the other outside,' co-operate 'to squeeze the welded seam between them * * * and thereby smooth out any internal or external burrs on the tube. The device is 'adapted for use with the so-called continuous welding machines.' The roller which is inside the tube is mounted on a mandrel having one or more supporting rollers. The mandrel is held in position by a rod extending back and beyond the welding electrodes and is fastened by a suitable bracket through the open seam cleft. The roller which smooths down the exterior burr 'may be secured to the welding apparatus or any suitable support.'

"This patent was held to be valid in the case of Steel & Tubes, Inc., v. Jackson Tube Co., supra, and by the District Court in the case at bar. The defendant, however, argues that this patent is invalid for the reason that the device described in the patent was not only well known to the prior art, but was also anticipated by several prior patents. * * *

"It may be true that an expert, after Belmont had made his contribution to the art, might go to the art and select one thing from one patent and another from another patent and from many bring together a combination which would produce the result achieved by Belmont. So could it be done in almost every other patent except purely pioneer patents, but the Belmont patent described a new combination of old elements which produced a new result and is valid. Otis Elevator Co. v. Interborough Rapid Transit Co., 222 F. 501 (C.C.A.2); Barber v. Otis Motor Sales Company, 240 F. 723 (C.C.A. 2)." National Tube Co. v. Steel & Tubes, supra.

All of the patents which the defendant has relied upon as showing anticipation of Belmont were in the National Tube Company suit.

## Belmont Infringed.

Claims 1 and 2 of Belmont are:

"1. In apparatus of the class described, the combination of means for heating the edges of a seam to be welded, pressure means for forcing said edges together to produce a weld, and rolls having relatively fixed axes arranged to operate on opposite sides of the weld to smooth down the burrs produced in making the weld.

"2. In apparatus of the class described, the combination of means for heating the longitudinal edges of a tube to be welded, means for forcing said edges together to produce a weld, a carriage arranged inside the tube and having rotatable supporting means engaging the surface of the tube opposite the weld, supporting means for the tube opposed to said rotatable supporting means, a roller on said carriage for operating on the weld to smooth down the interior burr, a roll on the exterior of the tube opposed to said roller and operating on the weld to smooth down the exterior burr, and means for holding said carriage in the desired position."

■ The apparatus of the defendant corresponds in every essential particular to the description of claim 1. Claim 2 is likewise infringed. A patent cannot be avoided by reconstructing the patented thing so imperfectly that its utility is diminished. If defendant contends that its construction is better than Belmont's, it does not follow that there is no infringement. Any superiority can only reside in the fact that defendant's carriage is allowed to rub on the bottom of the tube and this permits using discs of different diameters in the same head. This does not alter the fact that Belmont's invention has been appropriated.

Defendant contends that Belmont's patent is limited to an apparatus which operates upon the burr while it is hot and plastic. There is no limitation of that kind in either of the claims. The burr of the defendant's apparatus is never so cold that rolling will not produce the desired result, and that is all that is necessary to comply with the claims in suit.

The court finds the Johnston patent in suit valid and infringed as to claims 1 and 2 thereof. Further, the court finds the Belmont patent in suit valid and infringed as to claims 1 and 2 thereof.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½ (28 U.S.C.A. following section 723).

